State of Wisconsin, Plaintiff-Respondent,

v.

Calvin Jerome Pirtle, Defendant-Appellant.†

Court of Appeals

*No. 2010AP1363–CR. Submitted on Briefs April 7, 2011.
—Decided May 10, 2011.*

2011 WI App 89

(Also reported in 799 N.W.2d 492.)

† Petition for Review.

211

On behalf of the defendant-appellant, the cause was submitted on the briefs *Christopher J. Cherella* of *Law Offices of Christopher J. Cherella*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Michael C. Sanders*, assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. FINE, J. Calvin Jerome Pirtle appeals the judgment entered after a jury found him guilty of first-degree intentional homicide, *see* WIS. STAT. § 940.01(1)(a), and the order denying his motion for postconviction relief. Pirtle argues that: (1) the initial warrantless search of the house where he lived with his girlfriend was unconstitutional and the trial court should have suppressed the evidence; (2) the trial court should have let him fire his lawyer on the first day of trial; (3) the trial court should not have allowed him to voluntarily leave the courtroom for the first part of the trial; (4) the trial court should have granted his request for a mistrial; (5) he did not voluntarily waive his right to testify; and (6) he should be re-sentenced because the trial court said Pirtle was a "piece of garbage" during sentencing. We affirm.

**I.**

¶ 2. In September of 2008, Pirtle's girlfriend, Brandy Shields, called 911 after she found blood and a dead body in the basement of her home. Pirtle had been living with Shields "on and off" for three years. When

217

police arrived, Shields met Officer Ronald Hayes outside and Hayes "asked [her] for her key to her residence," and if he could "open the door?" Shields answered, "Yeah, here. Come on. Hurry up." Shields was worried because Pirtle was inside with her children. When Hayes entered the home, he saw Pirtle and asked him to wait outside with another officer so that the police could investigate what was going on. Pirtle was taken outside to a police wagon, but was not handcuffed, arrested, or otherwise physically restrained.

¶ 3. As Hayes walked into the home, he saw what he testified was "a large reddish brown substance on the floor," which he thought was blood. He asked Shields "where the basement was," and in it, he found the body of "a black female nude laying head first into [a] garbage can," as well as a driver's license identifying the victim as Yasmine Tatum-Massey. Hayes then "secured the scene" and waited for a detective to arrive.

¶ 4. Detectives Charles Mueller and Michael Braunreiter arrived to investigate. When Mueller saw the body, he asked if the police had consent to search the home. Braunreiter asked Pirtle if he would voluntarily consent to a search. Pirtle said "no." The detectives got a search warrant and then searched the home and collected evidence. They found Pirtle's blood on the victim and his DNA under her fingernails.

¶ 5. The police arrested Pirtle. He then confessed to killing Tatum-Massey and putting her body into the garbage can. Tatum-Massey died from "neck compression due to manual strangulation." Pirtle was charged with first-degree intentional homicide. His lawyer filed several pre-trial motions, including a motion to suppress evidence based on the initial warrantless entry. The trial court denied the motion, ruling that Shields's consent was sufficient.

¶ 6. On the first day of trial in February of 2009, Pirtle told the trial court that he wanted a new lawyer. When the trial court denied the request, Pirtle refused to come into the courtroom and missed *voir dire* and the preliminary jury instructions. The trial court, however, had set up a speaker system so that Pirtle could hear what was happening in the courtroom. After the lunch break on the second day of trial, Pirtle decided to return to the courtroom for the rest of the trial.

¶ 7. During the trial, Pirtle sought a mistrial after the trial court learned that a woman in the hallway who was, as the trial court found, unrelated to the case yelled "innocent innocent" at the jurors who were walking into the courtroom. The trial court held a hearing and determined that only two of the jurors heard the woman. It talked to those jurors individually in chambers and cautioned them that they each should disregard what they heard and not hold it against either side. One of these jurors was struck as an alternate before deliberations.

¶ 8. After the State rested, the trial court discussed on the Record with Pirtle whether he wanted to testify. Pirtle said that he did not want to testify and explained that he did not want to testify because of what he said were "circumstances which are going on with this lawyer," "this electronic device on my leg," and because he claimed that he was moved to a cell without heat. The trial court found that Pirtle waived his right to testify, and that even though Pirtle listed "preconditions," "he's making that choice freely, voluntarily and intelligently based on everything that's gone on here." As noted, the jury found Pirtle guilty.

¶ 9. At sentencing, all parties, including the defendant, were given a chance to speak. Then, the trial court began its sentencing analysis. Pirtle, however,

interrupted when the trial court said that Pirtle's 2007 arrest for second-degree sexual assault "sounds very similar to the set of circumstances that happened here":

THE DEFENDANT: So you are biased? Your opinion is biased is what I said.

THE COURT: I call them as I see them, Mr. Pirtle.

THE DEFENDANT: Just don't call me late for dinner.

THE COURT: No. I'll call you a piece of garbage.

THE DEFENDANT: I'll do the same with you. Just so you know, because there's been a whole bunch of judiciary misconduct going on also on your behalf. There was things that was going on during the trial that you should have been aware of and made a statement to, saying something about the State. It's your obligation because you're the Judge. And then —

THE COURT: I'll tell you what? When this is all over, I'm sure [your lawyer] will give you a copy or the address of the Judicial Commission.

THE DEFENDANT: Oh, I got it already.

THE COURT: And you can file your Complaint as to me.

THE DEFENDANT: I definitely will.

THE COURT: Beyond that, I've had enough.

¶ 10. When the trial court continued its sentencing analysis, it apologized: "I want the record to reflect . . . [that] I do want on the record to apologize for the statement that I made that he's a piece of garbage because that is not something that is judicial." The trial court sentenced Pirtle "to the Wisconsin State Prison System for life. He will not be eligible for extended

supervision." Pirtle filed a motion for postconviction relief, claiming the trial court was biased.

¶ 11. In the order denying his motion, the trial court admitted that its "piece of garbage" comment was not appropriate, but reiterated that it:

> [D]id not harbor any feelings of bias or prejudice against the defendant during the trial or sentencing proceedings .... The defendant was facing a mandatory life sentence for his crime. The only determination for the court to make was whether he would be eligible for release to extended supervision. The court considered the parties' sentencing arguments and the defendant's statement. The court's determination that the defendant [would] not be eligible for extended supervision was based solely upon the circumstances presented in this case and was in no way influenced by its exchange with the defendant at the sentencing hearing.

¶ 12. We address Pirtle's appellate contentions in turn.

## II.

A. *Initial warrantless entry.*

■■

¶ 13. In reviewing a trial court's order refusing to suppress evidence, we uphold a trial court's findings of historical fact unless they are clearly erroneous. *State v. Roberts*, 196 Wis. 2d 445, 452, 538 N.W.2d 825, 828 (Ct. App. 1995); *see also* WIS. STAT. RULE 805.17(2) (made applicable to criminal proceedings by WIS. STAT. § 972.11(1)). Whether a search was unreasonable or violated the Fourth Amendment, however, is a question of law that we review *de novo. State v. Richardson*, 156 Wis. 2d 128, 137–138, 456 N.W.2d 830, 833 (1990).

■

¶ 14. Pirtle claims that the initial entry into the home was illegal because the police did not have a warrant or *his* consent. Although under the Fourth Amendment, "[w]arrantless searches are 'per se' unreasonable," *State v. Kieffer*, 217 Wis. 2d 531, 541, 577 N.W.2d 352, 357 (1998) (quoted source omitted), consent is an exception to this general rule. *Id.*, 217 Wis. 2d at 541, 577 N.W.2d at 357. As noted, Shields called the police to her home and not only *consented* to their entering, but *asked* them to come in. When Pirtle was asked to wait outside, he did not object to the police being inside the home, nor did he say they could not search it. *Georgia v. Randolph*, 547 U.S. 103 (2006), upon which Pirtle relies, is thus not on point.

■

¶ 15. In *Randolph*, an estranged married couple, Scott and Janet Randolph, were fighting over the custody of their son. *Id.*, 547 U.S. at 106–107. Although Mrs. Randolph let the police search their home for illegal drugs, Mr. Randolph refused to give the police *his* permission. *Id.*, 547 U.S. at 107. *Randolph* held that in co-habitation cases, where both are present, a search is unlawful when one consents but the other *expressly refuses* to consent. *Id.*, 547 U.S. at 122–123. Unlike the situation in *Randolph*, Pirtle did not initially object to the police entering the home. He voluntarily walked out with the police and sat in the police wagon, leaving the other police officers with Shields, who had, as we have seen, asked them to come in. This made the initial entry and search lawful. When the police found the body, they stopped the search and asked for Pirtle's consent. When he refused to consent, the police got a search warrant

before continuing.[1] Accordingly, the trial court properly denied Pirtle's motion to suppress.

B. *Pirtle's request for a new lawyer.*

¶ 16. Whether a defendant's request for a new lawyer should be granted "is a matter within the circuit court's discretion," which we will not overturn "[a]bsent an erroneous exercise of discretion." *State v. Jones*, 2010 WI 72, ¶ 23, 326 Wis. 2d 380, 797 N.W.2d 378 (citations omitted). We look at: " '(1) the adequacy of the court's inquiry into the defendant's complaint; (2) the timeliness of the motion; and (3) whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case.' " *Id.*, ¶ 25, 326 Wis. 2d at 398, 797 N.W.2d at 388 (quoted source omitted).

¶ 17. In deciding a defendant's request for a new lawyer, the trial court should consider: "(1) The length of the delay requested; (2) Whether the 'lead' counsel has associates prepared to try the case in his absence; (3) Whether other continuances had been requested and received by the defendant; (4) The convenience or inconvenience to the parties, witnesses and the court; (5) Whether the delay seems to be for legitimate reasons; or whether its purpose is dilatory; (6) Other relevant factors." *Phifer v. State*, 64 Wis. 2d 24, 31, 218 N.W.2d 354, 358 (1974) (formatting altered).

---

[1] There is no support in the Record for Pirtle's contention in his reply brief that the police intentionally removed him "for the sole purpose of police avoiding his refusal to search."

¶ 18. Pirtle wanted to fire his lawyer because, according to Pirtle, his lawyer:

- "is not looking out for my best interest"

- "has not filed a competency exam [as] requested"

- "has not provided me with copies of legal work" or "request[ed] . . . a stay . . . to allow time to appeal"

- "has also allowed [the prosecutor] to give him crucial parts of the discovery two to three days before the trial begins"

- did not "file[] for a change of venue"

- "has only visited me a total of four times"

- "seems to be rushing this case to trial"

¶ 19. In ruling on the request on February 23, 2009, the first day of trial, the trial court addressed the six *Phifer* factors:

> Mr. Pirtle . . . has chosen to absent himself from the courtroom. He's chosen to not participate in the proceedings and chosen not to assist his lawyer. That is his choice . . . . I will not let a defendant rule what goes on in this courtroom.
>
> It is quite clear that Mr. Pirtle has . . . come under the influence of jailhouse lawyers. . . . he had indicated that he would be more than happy to have this inmate represent him at trial.
>
> . . . . Mr. Pirtle is . . . quite interested in delaying this matter at all costs.
>
> Let me finish up by making my record with regard to my ruling on the motion to deny the request to fire [his lawyer] on the day of trial.
>
> I will go through the factors set forth in Phifer . . . and that is as follows: The first factor I have to look at

224

is the length of the delay requested. As I stated before, if we are going to get a new lawyer on this case, the delay is going to be at least a number of months for that lawyer to become educated in what has gone on in this case. [Pirtle's lawyer] has done a lot of work on this case.

... So the length of the delay is going to be significant.

.... [M]y calendar is quite busy. And if we were to adjourn the case today, then it's highly unlikely that this matter would be able to be tried until mid to late summer at best.

Second of all, I have to look at whether lead counsel is competent to try the case. And I ... [am] quite confident that [Pirtle's lawyer] is competent to do so and is properly prepared.

. . . .

The third factor to look at is whether the defendant had requested and received other continuances. And he has not. . . .

With regard to number four, the convenience or inconvenience of the parties, witnesses and the Court, I have already explained that the Court does not have time to fit this matter into its calendar in the next couple of months, this is almost a week-long trial; more importantly, there are family members here of the victim, they are entitled to have prompt disposition of this matter and should not be inconvenienced.

. . . .

And ... it's my understanding that there is a witness who is coming in from out of town, which we have all been aware of and we have all been quite aware within the last couple of weeks especially that this matter was going to be tried today, and the reason why

225

we set it as a firm trial and sent another trial away was due to the fact that there was . . . a witness coming in from out of town.

Number five would be whether the delay would be seen for legitimate reason or whether it's dilatory. It's couched in a legitimate reasons, but for all of the reason[s] that I have stated on the record and for the matters set forth by [Pirtle's lawyer], none of those hold water, in my estimation; and clearly it's for dilatory purposes.

And then the sixth factor is whether any other relevant factors, and there aren't. This matter needs to be tried today.

■

¶ 20. The trial court found that Pirtle's request for a new trial lawyer was designed to delay the case. The trial court also found "that the conflict between the defendant and the attorney is not so great as to res[ult in] the total lack of communication." The trial court spent a substantial amount of time addressing each concern that Pirtle asserted:

- "I went through a very lengthy pretrial motion last week and [your lawyer] brought many motions that are not even usually brought in other cases properly briefed and well argued."

- "My take on the [competency] matter is that every time you've been in court you appear to be competent to me . . . . I don't see any basis for [a competency motion]."

- "And as far as appeal is concerned you don't have an absolute right to appeal in the middle of a trial. You have to wait until the case is over."

- "We spent two days litigating pretrial motions in this case." . . . "My observation . . . at the time of the

two motion hearings both on February 6th and February 9th were that Mr. Pirtle and [his lawyer] were getting along."

Pirtle's lawyer explained:

- "I am prepared to try this . . . . I have seen him at least six times in the jail, probably 12 to 15 hours . . . once a month at least."

- That he thought a competency or not-responsible plea by reason of mental disease or defect would be frivolous.

The trial court's decision is fully supported by its reasoning and the Record. It did not erroneously exercise its discretion in refusing to permit Pirtle to fire his lawyer on the trial's first day.

C. *Pirtle's leaving the courtroom.*

¶ 21. A defendant has a right to be present in the courtroom at every stage of the proceedings. *State v. Haynes*, 118 Wis. 2d 21, 25, 345 N.W.2d 892, 894 (Ct. App. 1984). That right, however, can be waived by consent or forfeited by conduct "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois v. Allen*, 397 U.S. 337, 343 (1970).

¶ 22. Pirtle both waived and forfeited his right to be in the courtroom. The trial court initially had Pirtle removed from the courtroom during the hearing on Pirtle's motion for a new lawyer because he was disruptive and disrespectful.

THE DEFENDANT: And that's what I am saying. What I am saying is this, you know, you saying that

he, you know, he doing everything in his power to help me. He ain't trying to help me. He ain't looking out for my best interest. That, that's bullshit. He ain't looking out for my —

THE COURT: First of all, I am not going to stand for the language in the courtroom.

THE DEFENDANT: Well, take me out.

THE COURT: I am not taking you anywhere right now.

THE DEFENDANT: No, I mean you say you ain't going to stand for it well you know that's why I am saying take me out. And no one taking me out and you ain't going to stand for it. What are you going to do? Gag me. Well, you better gag me then . . . .

THE COURT: In any event the court is going to make a finding with regard to - -

At that point, Pirtle interrupted, saying, "This is crazy." When the trial court said "we are going to proceed today . . . with the trial," Pirtle interrupted again: "I am going to keep doing everything that I'm doing because I have not been allowed to let this to happen to me." He then berated the trial court: "You don't know what you are talking about." When the trial court told an officer to: "Take him out for a moment. We will make arrangements to get this case started[,]" Pirtle said: "Yeah. You ought to do something. And we are going to get rid of you, too." Pirtle then left the courtroom.

¶ 23. After Pirtle was brought back into the courtroom, the trial court asked him: "are you going to cooperate and remain in the courtroom during the course of this trial?" Pirtle said, "No." The trial court then asked: "It's your choice to leave the trial; is that correct?" to which Pirtle answered, "Yeah." The trial

228

court warned him that "it's not in your best interest" to make that choice. Pirtle then argued with and swore at the trial court again as it was explaining its decision, saying: "Oh, shit. This is ridiculous." The trial court ignored Pirtle's remark and continued its explanation. When the trial court found that Pirtle and his lawyer "were getting along" at the motion hearings two weeks earlier, Pirtle said: "I should have fired him then. The fuckin dude got it all twisted. The mother fuckin dude over here think he . . . representing me. The dude ain't." The trial court tried to speak, but Pirtle interrupted again:

> THE DEFENDANT: He talking to him the whole time I'm trying to talking to him, he's talking to him before come talk to me. Who the fuck — he let them give him information on Thursday trying to talk to me about it. Fuck that. It's fucked up.
>
> THE COURT: In any event the court is going to make a finding that the conflict between the defendant and the attorney is not so great as to resolve the total lack of communication —

When Pirtle interrupted again, the trial court said: "Let's get through this, Mr. Pirtle, and I'll have you removed from the courtroom as you wish." Pirtle interjected, "You keep talking about let's get through this, let's get through. You ain't getting a mother fuckin thing." The trial court then took a break. When it reconvened, Pirtle's lawyer said that Pirtle was "in back, he's indicated he's not going to come out."

¶ 24. The Record conclusively shows that Pirtle both waived and forfeited his right to be present in court, until he decided to return and was permitted to do so. *See Allen*, 397 U.S. at 343 ("The flagrant disre-

229

gard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated."). Those who disregard the standards will not be rewarded by reversal on appeal.

D. *Denial of motion for mistrial.*

■■ ■■

¶ 25. A trial court's decision denying a motion for a mistrial is discretionary. *State v. Doss*, 2008 WI 93, ¶ 69, 312 Wis. 2d 570, 606, 754 N.W.2d 150, 168. The trial court must determine whether the alleged errors sufficiently prejudiced the defendant so as to require a new trial. *Id.*, ¶ 69, 312 Wis. 2d at 607, 754 N.W.2d at 168. We will reverse a trial court's denial of a motion for a mistrial " 'only on a clear showing of an erroneous use of discretion.' " *Ibid.* (quoted source omitted).

¶ 26. As we have seen, Pirtle sought a mistrial because a woman in the hall shouted "innocent, innocent." The trial court polled the jury and determined that only two jurors heard the woman's comments. It also found that the woman was not connected to either side in the case. The trial court told the two jurors, individually:

> You are instructed to disregard anything that went on there. It's not to be held against either of the parties.
>
> It appears from the information that we have that this is a random person who's in the hall and had nothing to do with either the State's case or the victim's family or the Defendant or any of his family, so it's not to be held against anyone.[2]

---

[2] The instruction to each of the two jurors varied slightly, but was the same in substance. We quote only one.

¶ 27. The trial court properly exercised its discretion in handling this situation. It ensured that Pirtle was not prejudiced by the woman's shouts and cautioned the two jurors. As we have seen, only one of the jurors was on the deliberating jury. We presume that the juror followed the trial court's instruction. *See State v. Adams*, 221 Wis. 2d 1, 12, 584 N.W.2d 695, 700 (Ct. App. 1998) ("Jurors are presumed to follow the court's instructions."). The trial court did not erroneously exercise its discretion in denying Pirtle's motion for a mistrial.

E. *Pirtle's waiver of his right to testify.*

¶ 28. Pirtle claims that his constitutional rights were violated when the trial court accepted his decision not to testify. A criminal defendant has a fundamental constitutional right to testify, but the right can be waived. *State v. Weed*, 2003 WI 85, ¶ 40, 263 Wis. 2d 434, 463, 666 N.W.2d 485, 498. If a defendant waives the right to testify, the trial court "should conduct a colloquy with the defendant in order to ensure that the defendant is knowingly and voluntarily waiving his or her right to testify." *Ibid.* "The colloquy should consist of a basic inquiry to ensure that (1) the defendant is aware of his or her right to testify and (2) the defendant has discussed this right with his or her counsel." *Id.*, 2003 WI 85, ¶ 43, 263 Wis. 2d at 464, 666 N.W.2d at 499. "A trial court's ruling on whether a waiver was knowing and voluntary presents mixed questions of fact and law." *State v. Arredondo*, 2004 WI App 7, ¶ 12, 269 Wis. 2d 369, 383, 674 N.W.2d 647, 653 (2003). The trial court's findings of fact will be upheld unless they are clearly erroneous. *Ibid.* Applying facts to "constitutional

principles is a question of law that we review *de novo*."
*Id.*, 2004 WI App 7, ¶ 12, 269 Wis. 2d at 384, 674
N.W.2d at 653.

■■

¶ 29. The trial court determined that Pirtle's
waiver was knowing and voluntary:

> THE COURT: Let's go back on the record. Couple
> things. First of all, let's talk to Mr. Pirtle about whether
> he wishes to testify or not.
>
> Have you had enough time to talk to your client,
> [defense lawyer]?
>
> [DEFENSE LAWYER]: Yes.
>
> THE COURT: And, Mr. Pirtle, have you had
> enough time to talk to your lawyer about whether you
> testify or not?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You understand that you make the
> choice whether you testify or not in this case, no one
> can force you —
>
> THE DEFENDANT: Yes.
>
> THE COURT: — Either way, but you do have to
> make a choice.
>
> THE DEFENDANT: Yes.
>
> THE COURT: You have gone over it with your
> lawyer and you understand that if you testify in this
> matter that you're subject to full cross-examination?
>
> THE DEFENDANT: Yes.
>
> THE COURT: I don't know, is there a prior
> record?
>
> [PROSECUTOR]: Yes.

THE COURT: Do you understand your prior record could be used against you only for purposes of credibility?

THE DEFENDANT: Yes.

THE COURT: What is your choice? What is your choice, do you wish to testify or not?

THE DEFENDANT: Not.

¶ 30. When the trial court asked Pirtle whether he had been forced into waiving his right to testify, he answered:

Okay. My name is Calvin Pirtle. I just want to go on the record saying that there are reasons why I'm not going to testify in my own defense. This lawyer has not given me all the discovery, some of which I had just got yesterday while in the court proceedings — while the court proceedings were going on. There are other circumstances which are going on with this lawyer as well as in the jail. I have this electronic device on my leg for being disruptive when I clearly stated to [my lawyer] that I no longer wanted — when I clearly stated that [my lawyer] was no longer going to be representing me.

Also I feel that — Also I feel as a tactical ploy I was placed in a different cell when I went back to the 4D yesterday. The cell I was in had heat, now in this other cell there is none. I did nothing to get moved.

Also — Also, I let, or at least tried, to let this lawyer know that there are other issues regarding statements or lack of made by myself, so even the opening statement was off.

Having said this on the record, I do not feel it is in my best interest to take the stand with him as appointed counsel due to comments and actions, or lack of, to myself by [my lawyer].

233

¶ 31. The trial court discussed with Pirtle each of these complaints. It explained why the electronic device was on his leg and that this would not prevent him from "testifying if you wish to in this case." The trial court asked about the discovery matter, and the defense lawyer said it was a lab report regarding the victim's body, and that he had discussed it with Pirtle. When the trial court asked about Pirtle's complaint that he was put in a cell without heat, Pirtle said it was because a smoke detector was not working properly. Finally, Pirtle's lawyer told the trial court he had discussed with Pirtle the advantages and disadvantages of testifying, but was concerned that Pirtle was trying to "claim[] involuntariness. He's saying that something else caused him not to get on the stand." The trial court then asked Pirtle: "Is that what you are saying?" Pirtle answered: "I stated what I'm saying."

¶ 32. The trial court found "that the defendant is choosing not to testify today and he's making that choice on his own, no one has forced him to do that; that he's making that choice even though it appears that there is some preconditions here, he's making that choice freely, voluntarily and intelligently."

¶ 33. The trial court's findings are supported by the Record. Moreover, the trial court's inquiry as to whether Pirtle wanted to testify or not fulfilled its obligations under *Weed*. The trial court established that Pirtle knew he had the right to testify and that he had discussed it with his lawyer. Pirtle's contention that he was denied his constitutional right to testify is without merit.

F. *Alleged judicial bias at sentencing.*

¶ 34. Pirtle claims that he deserves a new sentencing hearing because the trial court's "piece of gar-

bage" remark showed judicial bias, resulting in an unfair sentence. In analyzing a judicial-bias claim, we start with the "presumption that the judge is free of bias and prejudice." *State v. Neuaone*, 2005 WI App 124, ¶ 16, 284 Wis. 2d 473, 485, 700 N.W.2d 298, 304. Pirtle has the burden to prove the trial court was biased. *See ibid.*

> In determining the question, we apply both a subjective and an objective test. We first look to the challenged judge's own determination of whether the judge will be able to act impartially. Next, we look to whether there are objective facts demonstrating that the judge was actually biased. This requires that the judge actually treated the defendant unfairly.

*Ibid.* (citations omitted). Whether a judge was objectively not impartial is a question of law that we review independently. *Murray v. Murray*, 128 Wis. 2d 458, 463, 383 N.W.2d 904, 907 (Ct. App. 1986). A judge's negative comments do not automatically equal bias:

> *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States*, 510 U.S. 540, 555–556 (1994) (emphasis by *Liteky*).

¶ 35. Neither we nor, significantly, the trial court approve calling any party or person in court "a piece of garbage." The Record here reflects, however, the trial court's justifiable frustration with Pirtle's disruptions

235

and disrespect. The trial court's admitted momentary lapse does not, in any sense of the word, reflect objective bias. Further, the trial court subjectively determined that it was not biased. This determination is binding. *See State v. McBride*, 187 Wis. 2d 409, 415, 523 N.W.2d 106, 110 (Ct. App. 1994).

¶ 36. We affirm.

*By the Court.*—Judgment and order affirmed.