ANN WALSH BRADLEY, J.
¶ 1. Petitioner, Jesse Herrmann, seeks review of an unpublished de *340 cisión of the court of appeals affirming his judgment of conviction and a circuit court order denying postconviction relief.[1] The court of appeals determined that statements made by the circuit court judge at sentencing were insufficient to support a conclusion that she was biased.
¶ 2. On review, Herrmann asserts that the circuit court's statements at sentencing revealed that she lacked impartiality, in violation of his due process rights. Specifically, he contends that the judge's references to her sister's death in a car accident similar to the one involved in Herrmann's case created the appearance of bias.
¶ 3. There is a presumption that a judge acted fairly, impartially, and without prejudice. State v. Goodson, 2009 WI App 107, ¶ 8, 320 Wis. 2d 166, 771 N.W.2d 385. A defendant may rebut the presumption by showing that the appearance of bias reveals a great risk of actual bias. Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 885 (2009); Goodson, 320 Wis. 2d 166, ¶ 14; State v. Gudgeon, 2006 WI App 143, ¶ 23, 295 Wis. 2d 189, 720 N.W.2d 114; see also Williams-Yulee v. Florida Bar, 135 S. Ct. 1656 (2015). Such a showing constitutes a due process violation. Gudgeon, 295 Wis. 2d 189, ¶ 23.
¶ 4. We conclude that Herrmann has failed to rebut the presumption of impartiality. When the sentencing court's statements are viewed in context, they do not reveal a great risk of actual bias. Because we *341 determine that no due process violation has been established, we affirm the court of appeals.
I
¶ 5. The facts in this case are undisputed. In June 2011 police were called to the scene of an automobile accident where a pickup truck had rear-ended a car stopped in the left-hand lane of a road, waiting to make a left turn. The truck hit the car with such force that it pushed the car into oncoming traffic. The grill of the truck ended up in the back seat of the car. There were five passengers in the car, three in the back seat and two in the front. One died at the scene, the other four sustained serious injuries.
¶ 6. The driver of the truck ran from the scene into the woods toward a nearby bar. Bystanders pursued the driver and kept him there until police arrived. After their arrival, officers identified the driver as Jesse Herrmann and smelled the strong odor of alcohol emanating from him. Upon questioning, Herrmann indicated that he did not know where he was or what was happening. He further stated that he had consumed too much alcohol to be driving. Officers also observed an unopened can of beer lying on the highway and another unopened can lying on the floor of Herrmann's truck. A subsequent blood test showed that his blood alcohol concentration was 0.215.
¶ 7. Herrmann was arrested and charged with two counts of operating a motor vehicle while intoxicated causing injury as a second and subsequent offense, along with several repeater offenses: homicide by intoxicated use of a vehicle, two counts of injury by intoxicated use of a vehicle, hit and run resulting in death, hit and run resulting in injury, and first degree *342 reckless endangerment. As a result of a plea agreement, the State dropped the hit and run resulting in injury charge and the reckless endangerment charge and Herrmann pled guilty to the charges that remained. The plea reduced Herrmann's maximum possible sentence from 181.5 years of imprisonment to 134 years of imprisonment.
¶ 8. Prior to sentencing, the circuit court ordered a pre-sentence investigation. The resulting report detailed Herrmann's prior record, including a prior offense of operating while intoxicated and possession of an open intoxicant in a vehicle. He also had a conviction for disorderly conduct which resulted from his being intoxicated, multiple convictions for bail jumping, and a conviction for conspiracy to possess with intent to distribute methamphetamine. He was one month into a five-year period of probation from his drug offense when the accident occurred. The report notes that Herrmann told his parole agent that although he was participating in substance abuse programs, he thought "it was a waste of time and money." Ultimately, the report recommended that Herrmann be sentenced to a 40 year period of confinement followed by 20 years of extended supervision.
¶ 9. Herrmann requested and obtained an alternative pre-sentence investigation. Focusing primarily on statements from Herrmann's family members, it recommended a sentence of 12-15 years confinement followed by 20 years of extended supervision.
¶ 10. At the beginning of the sentencing hearing, the judge disclosed that she lost her sister to a drunk driver in 1976. She told Herrmann "I don't believe that this will have any impact on my ability to set that aside and sentence you based upon the information presented on your case." She then asked Herrmann if *343 he had any question about that or problems with it. He indicated that he did not and the sentencing hearing proceeded.
¶ 11. Several individuals spoke at the hearing. The victims, their family members, a pastor, and witnesses who were at the scene testified about the long-lasting effects the accident has had upon them and the community. Several asked for the court to impose the maximum sentence, citing the fact that Herrmann had not learned his lesson from his prior incarceration. Members of Herrmann's family and his friends spoke as well, trying to convey that he was not "a monster" and that he needed treatment.
¶ 12. Prior to issuing the sentence, the judge acknowledged that "there have been a lot of communications today, this morning and afternoon, about whether or not Mr. Herrmann is a monster." She then indicated that she felt "compelled to answer that" in her statement.
| 13. First, she made a statement about the problem of alcohol in our society, emphasizing that it is not limited to Mr. Herrmann:
It is so easy to be in this community, and like [the] Pastor indicated, I, too, have been shocked by the seeming blasé faire attitude that this community has about alcohol use, because it is easy when these tragedies occur to paint the person who's behind the wheel while intoxicated to be a monster, and so we have a lot of grief and a lot of energy and a lot of community outrage, and that community outrage is aimed and directed at the person behind the wheel, and I believe that when we do that, we lose an opportunity, we lose an opportunity for raising the consciousness of the community because we are not just here because of Mr. Herrmann ....
*344 ¶ 14. The judge explained that although people complain about drunk driving, individuals do little to actively change behavior:
People that get behind the wheel of a car while they have been drinking in my opinion any amount are putting themselves and this community at risk, and yet day after day, month after month our community just says, oh, well. We complain and we talk about how we should challenge the students at the university not to continually drink to excess, how kids disappear, and how much harm alcohol is, but how many of us actively, actively seek to change the behaviors of those in our lives? How many of us go out for that Friday fish fry and then not make any arrangements for who's going to drive the car home?
¶ 15. Next, she recognized factors in Mr. Herrmann's background mitigating his culpability:
Mr. Herrmann, if you look at his history [he] was the son of an alcoholic, alcoholism was in his family, the product of a broken home, involved in our juvenile justice system as a • — as a juvenile, involved in our criminal justice system as an adult. He is a failure of what we do with children, with adolescents, and with adults who suffer and who continue to self-medicate, if we want to say as [his attorney] says, or just simply continue to use alcohol irresponsibly to the detriment of our society. How many other young children are on the streets of our community who also like Mr. Herrmann come from situations where alcohol and the use of alcohol is a readily acceptable thing, that the overindulgence in alcohol is in many places cheered, where their 21st birthday is looked forward to not as a celebration of coming to adulthood but how many shots they can drink at the local taverns?
*345 ¶ 16. The judge then discussed how drunk driving affected her own life as her sister had been killed by a drunk driver:
In 1976 five young women got into a vehicle, and only one of them survived. The two gentlemen in the other vehicle were 17, drunk out of their minds, and they did not survive. That was my personal story, and I will tell you that a day does not go by that I do not think of that personal tragedy, and I wish that I could tell these victims that that pain will one day disappear, but it doesn't. Time makes it less. We redirect ourselves to other things, and a day does go by when we don't think of our loved ones and then we feel guilty at night because that happened, but life does go on, and I am very grateful today that I'm looking at four lovely young ladies and that only one family has to go through the pain that my family and the other three young ladies' families had to endure in 1976.
¶ 17. She further explained that although she understood the pain the families and victims were suffering, she knew from experience that no matter what sentence she gave Mr. Herrmann, it would not alleviate that pain:
And so perhaps it is again destiny or a higher power or, Pastor, probably the prayers of many others that bring me to be the judge on this particular case because I probably more than anyone else who would be able to sit on this bench in this county understand the pain that these victims are feeling, but I have had the benefit of all those years since 1976 to understand that I have to make Mr. Herrmann pay, but that nothing I do to him will lessen that pain, and that if I don't do more than just incarcerate Mr. Herrmann, if I don't speak out on behalf of my community today, then this tragedy will continue to happen on our streets, and more families will suffer the way these families suffer today.
*346 ¶ 18. She again emphasized that the accident should not be viewed as Mr. Herrmann simply being a monster, rather it is indicative of a greater problem that our society has with drinking and driving:
So, Mr. Herrmann, you're going to prison today, but that's just part of the story. I want to make sure that the story is not about what a monster Jesse Herrmann was and is so that we can then wrap up this little episode in a nice neat little box and all go about our business as usual, that Mr. Herrmann the monster is off the streets, and we don't have to worry about this again, because no matter what I do to Mr. Herrmann, unless this community begins to take a different attitude about drinking and driving, and I'm talking about a different attitude, not paying lip service, but actually doing, we will see this tragedy happen again and again.
¶ 19. The judge next reviewed Herrmann's character and his poor choices leading up to the accident. In particular, she discussed Herrmann's recent release from federal prison, reliance on alcohol, resistance to treatment, and Herrmann's reported attitude with authority. Additionally, the judge looked at the gravity of the offense and gave consideration to the number of witnesses who testified to the effects that Herrmann's crime had and continue to have on them. As mitigating factors, the judge considered Herrmann's guilty plea, age, and the fact that he has a family.
¶ 20. Weighing all these factors, the court imposed consecutive sentences on the various counts totaling 31 years initial confinement followed by 40 years of extended supervision. In addition, the court imposed and stayed a consecutive sentence of 20 years of confinement for the charge of hit and run resulting in death, and ordered 15 years of probation.
*347 ¶ 21. Herrmann filed a postconviction motion seeking resentencing by a different judge. He asserted that the circuit court described a personal experience that reflected an objective bias in sentencing and that the court's emotional involvement in the crime amounted to an improper factor on which the sentence was based. The circuit court denied the motion, explaining that Herrmann took her remarks out of context.
I 22. On appeal, Herrmann again argued that the circuit court's statements at sentencing supported a conclusion that the judge was biased. The court of appeals disagreed. State v. Herrmann, No. 2013AP197-CR, unpublished slip op. (Wis. Ct. App. Feb. 13, 2014). The court observed that it is not uncommon for circuit court judges to have been personally victimized by the types of crimes that are before them. Id., ¶ 9. In this case, the judge's statements merely reflected that she understood the crime's effect on the victims. Id., ¶ 10. Viewing the sentencing as a whole, the court of appeals determined that a reasonable person would not conclude that the judge was biased. Id.
II
¶ 23. We are asked to determine whether the circuit court judge's statements at sentencing establish that she was objectively biased in violation of Herrmann's due process rights. "Whether a judge was objectively not impartial is a question of law that we review independently." State v. Pirtle, 2011 WI App 89, ¶ 34, 334 Wis. 2d 211, 799 N.W.2d 492; see also Goodson, 320 Wis. 2d 166, ¶ 7 ("Whether a circuit *348 court's partiality can be questioned is a matter of law that we review independently.").
¶ 24. There is a presumption that a judge has acted fairly, impartially, and without prejudice. Goodson, 320 Wis. 2d 166, ¶ 8; State v. McBride, 187 Wis. 2d 409, 414, 523 N.W.2d 106 (Ct. App. 1994). The presumption is rebuttable, placing the burden on the party asserting the bias to show that bias by a preponderance of the evidence. State v. Gudgeon, 295 Wis. 2d 189, ¶ 20; McBride, 187 Wis. 2d at 415.
Ill
¶ 25. "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" Caperton, 556 U.S. at 876 (quoting In re Murchison, 349 U.S. 133, 136 (1955)); see also Guthrie v. WERC, 111 Wis. 2d 447, 454, 331 N.W.2d 331 (1983) ("It is, of course, undisputable that a minimal rudiment of due process is a fair and impartial decisionmaker."). Thus, a biased decisionmaker is "constitutionally unacceptable." Withrow v. Larkin, 421 U.S. 35, 47 (1975). As the court of appeals has acknowledged, "[t]he right to an impartial judge is fundamental to our notion of due process." Goodson, 320 Wis. 2d 166, ¶ 8.
¶ 26. In determining whether a defendant's due process right to trial by an impartial and unbiased judge has been violated, Wisconsin courts have taken both subjective and objective approaches; "[t]he court applie[s] a subjective test based on the judge's own determination of his or her impartiality and an objective test based on whether impartiality can reasonably *349 be questioned." State v. Rochelt, 165 Wis. 2d 373, 378, 477 N.W.2d 659 (Ct. App. 1991). It is the application of the objective test which is at issue in this case.
¶ 27. Under the objective approach, courts have traditionally considered whether "there are objective facts demonstrating . . . the trial judge in fact treated [the defendant] unfairly." Goodson, 320 Wis. 2d 166, ¶ 9 (quoting McBride, 187 Wis. 2d at 416). In other words, they inquire into whether a reasonable person could conclude that the trial judge failed to give the defendant a fair trial.
¶ 28. This approach is illustrated by State v. Rochelt, 165 Wis. 2d 373. In that case, the defense discovered a letter from the circuit court judge in the prosecutor's file which had been sent to instructors at Police Training Services, requesting that certain officers be released from classes to testify at trial. Id. at 377-78. The letter described the officers as " 'two individuals, with clean, impeccable records, and with nothing to gain or lose by their testimony,' suggesting possible prejudgment of their credibility." Id. at 379.
¶ 29. The circuit court denied the defendant's recusal motion and the court of appeals affirmed. It agreed that the judge's letter raised questions about his impartiality. However, in assessing whether there was actual bias, the court determined that nothing in the record tended to show that the judge had failed to give the defendant a fair trial. Id. at 381. It referenced the fact that the defendant had given no examples of unfairness. Id. Accordingly, it "conclude[d] that even though the trial judge's letter raise [d] a reasonable question regarding the judge's impartiality, the fact is that [the defendant] received a fair trial." Id.
*350 ¶ 30. Courts have since recognized that the right to an impartial decisionmaker stretches beyond the absence of actual bias to encompass the appearance of bias as well. In Gudgeon, 295 Wis. 2d 189, the court of appeals considered the situation where a judge had declined a probation agent's request to convert the defendant's restitution obligations into a civil judgment in a short note stating "No — I want his probation extended." Id., ¶ 3. At a subsequent extension hearing, the judge extended the defendant's probation. The defendant alleged that the note showed the judge was biased in favor of a particular result before listening to the evidence. Id., ¶ 1.
¶ 31. In setting forth the test for objective bias, the Gudgeon court acknowledged that it was difficult to discern from prior cases whether actual bias was necessary to show a due process violation, or merely one method that was sufficient to make the showing. Id., ¶ 22. It observed that federal precedent suggested that even the appearance of partiality can violate due process:
" [E]very procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." Tumey v. Ohio, 273 U.S. 510, 532 (1927). Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954).
Id., ¶ 21 (quoting In re Murchison, 349 U.S. at 136). The Gudgeon court recognized that the seemingly divergent cases shared a common theme: the appear *351 anee of partiality violated due process "only where the apparent bias revealed a great risk of actual bias." Id., ¶ 23.
1 32. Ultimately, the Gudgeon court found the federal jurisprudence persuasive. Incorporating Murchison's language, it concluded that "the appearance of bias offends constitutional due process principles whenever a reasonable person — taking into consideration human psychological tendencies and weaknesses — concludes that the average judge could not be trusted to 'hold the balance nice, clear and true' under all the circumstances." Id., ¶ 24.
¶ 33. The court of appeals later repeated this test in Goodson, 320 Wis. 2d 166, ¶ 9. In that case, a judge told a defendant during sentencing that if he violated the rules of extended supervision "you will come back here, and you will be given the maximum, period." Id., ¶ 2. Later, at a reconfinement hearing after the defendant's supervision was revoked, the judge ordered the defendant reconfined for the maximum period. Id., ¶ 5. Applying its test for objective bias, the court of appeals determined the defendant's due process rights were violated because a reasonable person would conclude "that the judge had made up his mind about [the defendant's] sentence before the re-confinement hearing." Id., ¶ 13.
¶ 34. Similarly, in Caperton, 556 U.S. 868, the United States Supreme Court reaffirmed its position that actual bias need not be shown to establish a violation of a party's right to a fair tribunal. In that case, the Court considered whether the petitioner's due process rights were violated when one of the West Virginia Supreme Court justices refused to recuse *352 himself after receiving large campaign contributions from the respondent corporation's chief executive officer.
¶ 35. After observing the difficulties in discerning the real motives at work in deciding a case, the Court announced that "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias." Id. at 883. "Due process 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" Id. at 886 (quoting Murchison, 349 U.S. at 136). Like the court of appeals in Gudgeon, the Court focused on whether there was a serious risk of actual bias.[2]
¶ 36. Its inquiry into whether there was a serious risk of actual bias centered on the circumstances of the case, which the Court referred to as exceptional. Id. at 884. The Court acknowledged the large size of the contributions in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contributions had on the outcome of the election. It further observed the close temporal relationship between the campaign contributions, the justice's election, and the pendency of the case. Id. at 886. Under these circumstances, the Court concluded that "there is a serious risk of actual bias — based on objective and reasonable perceptions — when a person with a per *353 sonal stake in a particular case had a significant and disproportionate influence in placing the judge on the case . ..." Id. at 884.
¶ 37. Admittedly, the Supreme Court was careful to limit its analysis. Although it ultimately concluded that the appearance of bias that it was reviewing violated due process, the Court described this as "an extraordinary situation where the Constitution requires recusal." Id. at 887. Like the Gudgeon court, it observed that its prior cases requiring recusal "dealt with extreme facts that created an unconstitutional probability of bias." Id.
¶ 38. However, in determining that there was a serious risk of actual bias the Court provided a test that can apply to a multitude of scenarios: "Due process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." Id. at 885. It embraced that framework in its conclusion: "We find that Blakenship's significant and disproportionate influence — coupled with the temporal relationship between the election and the pending case — 'offer a possible temptation to the average judge to . . . lead him not to hold the balance nice, clear and true.'" Id. at 886.
¶ 39. More recently, the Supreme Court reaffirmed that there is a " 'vital state interest' in safeguarding 'public confidence in the fairness and integrity in the nation's elected judges.'" Williams-Yulee, 135 S. Ct. at 1666 (quoting Caperton, 556 U.S. at 889). It acknowledged that "[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record." Id. at 1667. Nevertheless, "jus *354 tice must satisfy the appearance of justice." Id. at 1666 (quoting Offutt, 348 U.S. at 14). There is a compelling interest in avoiding "possible temptation [s] . . . 'which might lead [a judge] not to hold the balance, nice, clear and true.'" Id. (quoting Turney, 273 U.S. at 532).
¶ 40. We acknowledge the concerns raised by Caperton and Williams-Yulee. A fundamental principle of our democracy is that judges must be perceived as beyond price. Likewise, we recognize that the precedent established by the United States Supreme Court and our court of appeals provides that in limited situations the appearance of bias can offend due process. Specifically, the appearance of bias violates due process when there is "a great risk of actual bias." Gudgeon, 295 Wis. 2d 189, ¶ 23; see also Caperton, 556 U.S. at 884 (considering whether there is "a serious risk of actual bias").
¶ 41. Lest there be any confusion engendered by the separate writings below, Caperton addressed recusal in the context of the appearance of bias. Relying on a case that originated in Wisconsin, Caperton specifically announced that it was not addressing whether there was actual bias.:
We do not question his subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias . ..
[T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias. In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."
*355 Id. at 883-84 (quoting Withrow v. Larkin, 421 U.S. at 47). It explained that due process may require recusal even when actual bias is not present:
Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties."
Id. at 886 (quoting Murchison, 349 U.S. at 136).
¶ 42. As evidenced by the separate writings, this court has a difficult relationship with the issue of recusal and its controlling precedent in the context of the appearance of bias.[3]
*356 ¶ 43. The concurrence of Justice Ziegler discusses Caperton at length, so severely cabining its reach that it appears to apply only during a "perfect storm" in West Virginia. Justice Ziegler's concurrence, ¶ 138. Taking a different approach, the concurrence of Justice Prosser acknowledges that it is uncomfortable with controlling precedent stating "[cjlearly, this writer is uncomfortable with the decisions in Gudgeon and Goodson." Justice Prosser's concurrence, ¶ 102. It takes to task both District Two and District Three of the court of appeals by asserting several inadequacies *357 in the Gudgeon and Goodson opinions, including that they are not forthright in disclosing all the facts of the cases. Id.
¶ 44. This court has previously and extensively analyzed and re-analyzed the issue of judicial recusal in the context of the appearance of bias. See, for example, State v. Allen, 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863, where our writings covered 128 pages of the Wisconsin Reports. See also Ozanne v. Fitzgerald, 2012 WI 82, 342 Wis. 2d 396, 822 N.W.2d 67; State v. Henley, 2011 WI 67, 338 Wis. 2d 610, 802 N.W.2d 175.
¶ 45. The separate writings today appear to continue that discussion, but add little additional insight or argument. Rather than re-engage in the debate at length here and skew the focus of this opinion, the reader is instead referred to our prior lengthy discussion of the issue in the cases cited above.
¶ 46. In sum, when determining whether a defendant's right to an objectively impartial decision-maker has been violated we consider the appearance of bias in addition to actual bias. When the appearance of bias reveals a great risk of actual bias, the presumption of impartiality is rebutted, and a due process violation occurs. Caperton, 556 U.S. at 885; Goodson, 320 Wis. 2d 166, ¶ 9; Gudgeon, 295 Wis. 2d 189, ¶¶ 21, 24.
¶ 47. We turn next to apply this test to the facts of this case.
IV
¶ 48. Herrmann contends that the circuit court judge's statements about her sister could cause a *358 reasonable person to question her impartiality. Specifically, he points to the judge's statement about her sister's car accident during the sentencing hearing:
In 1976 five young women got into a vehicle, and only one of them survived. The two gentlemen in the other vehicle were 17, drunk out of their minds, and they did not survive. That was my personal story, and I will tell you that a day does not go by that I do not think of that personal tragedy, and I wish that I could tell these victims that that pain will one day disappear, but it doesn't. Time makes it less. We redirect ourselves to other things, and a day does go by when we don't think of our loved ones and then we feel guilty at night because that happened, but life does go on, and I am very grateful today that I'm looking at four lovely young ladies and that only one family has to go through the pain that my family and the other three young ladies' families had to endure in 1976.
¶ 49. He also points to the judge's statement about understanding the pain the families and the victims were suffering:
And so perhaps it is again destiny or a higher power or, Pastor, probably the prayers of many others that bring me to be the judge on this particular case because I probably more than anyone else who would be able to sit on this bench in this county understand the pain that these victims are feeling, but I have had the benefit of all those years since 1976 to understand that I have to make Mr. Herrmann pay, but that nothing I do to him will lessen that pain, and that if I don't do more than just incarcerate Mr. Herrmann, if I don't speak out on behalf of my community today, then this tragedy will continue to happen on our streets, and more families will suffer the way these families suffer today.
Like the circuit court and the court of appeals, we *359 conclude that, when viewed in context, a reasonable person would not question the court's partiality based on these statements.
¶ 50. In this case there was a lengthy sentencing hearing. Twenty individuals testified before the judge issued the sentence, including each of the four surviving victims. The first victim to testify spoke about the loss of her friend in the accident and the trouble she was having coping with that loss, in addition to her own injuries. The next victim testified about how Herrmann chose to drink and how selfish it was for him to run away after the crash. She requested that the court hold him accountable. These sentiments were repeated by the third victim, who likewise criticized Herrmann for running away. The last victim to testify focused on how long it was taking for them to recover, and how much their friend will be missed.
¶ 51. The victims' testimony was followed by testimony from their families. Several individuals spoke about how beloved the deceased victim had been and how devastating the injuries were to the surviving victims. They requested that the court not allow Herrmann the opportunity to ever drive drunk again or to make similar poor decisions in the future. They stressed that he had chosen to drink and chosen to drive. They requested that justice be done and stated that in this case, there was no reason to impose anything but the maximum sentence.
1 52. A pastor from the community also spoke. He asked the court "to make a clear statement that we will not tolerate the abuse of alcohol, that we will not look with leniency upon the devastating consequences of the willful abuse of alcohol." He likewise stressed that Herrmann's actions were willful and had a dev *360 astating impact on the community. He requested that the court impose the maximum penalty.
¶ 53. The pastor's testimony was followed by the statement of an individual who was present at the scene. He saw Herrmann's truck smash into the car and stopped to help. He spoke about the gruesome nature of the scene and that Herrmann just ran away. Another witness's statement was read into the record. The crash occurred near his house and he ran out to help. He indicated that while he was trying to help the victims and waiting for emergency responders to arrive, Herrmann appeared not to care how the victims were doing.
¶ 54. There were also witnesses who spoke on behalf of Herrmann. His mother expressed her sympathy for the victims and stated that this was an accident, not something Herrmann had planned. Although he was being portrayed as a monster, she explained that Herrmann was a caring son, grandson, father, brother, uncle, and friend. No amount of prison time was going to bring back the deceased or take away any of the victims' pain and suffering.
¶ 55. Similarly, the mother of Herrmann's son testified that he was a good father. She stressed that this was not an intentional act. One of his friends spoke about how Herrmann had assisted her when she needed help. His sister explained that he had been a good brother. His father testified that Herrmann would never intentionally harm anyone and reiterated that he was not a monster. Lastly, Herrmann's grandmother spoke. She expressed her sympathies for the victims and stated that Herrmann had been a good grandson.
¶ 56. It was after hearing all of these statements that the judge apparently felt compelled to answer the assertions about Herrmann being a monster. She be *361 gan by acknowledging that there is a problem of drinking and driving in our society, which is not limited to Herrmann. Then, she recognized multiple factors in Herrmann's background mitigating his culpability, including the fact that there was alcoholism in his family, he came from a broken home, and had been involved in the juvenile justice system.
¶ 57. She suggested that Herrmann's story illustrates society's failure to help children and to help adults who suffer with alcoholism. She asked "How many other young children are on the streets of our community who also like Mr. Herrmann come from situations where alcohol and the use of alcohol is a readily acceptable thing[?]"
¶ 58. It was at this point that the judge brought up her sister's accident, assuring the victims and their family members that she understood that such an accident is a painful tragedy. Her remarks, however, also conveyed that although she understood the pain the families and victims were suffering, no matter what sentence she gave Mr. Herrmann, it would not alleviate that pain:
I have had the benefit of all those years since 1976 to understand that I have to make Mr. Herrmann pay, but that nothing I do to him will lessen that pain, and that if I don't do more than just incarcerate Mr. Herrmann, if I don't speak out on behalf of my community today, then this tragedy will continue to happen on our streets, and more families will suffer the way these families suffer today.
¶ 59. The judge then emphasized that the accident should not be viewed as Mr. Herrmann simply being a monster, rather it is indicative of a greater problem that our society has with drinking and driving:
*362 So, Mr. Herrmann, you're going to prison today, but that's just part of the story. I want to make sure that the story is not about what a monster Jesse Herrmann was and is so that we can then wrap up this little episode in a nice neat little box and all go about our business as usual, that Mr. Herrmann the monster is off the streets, and we don't have to worry about this again, because no matter what I do to Mr. Herrmann, unless this community begins to take a different attitude about drinking and driving, and I'm talking about a different attitude, not paying lip service, but actually doing, we will see this tragedy happen again and again.
¶ 60. In this context, it is apparent that although the judge's statements about her sister were personal, they were used in an attempt to illustrate the seriousness of the crime and the need to deter drunk driving in our society. They do not appear as an expression of bias against Herrmann.
¶ 61. As the judge's statements addressed the seriousness of the crime and the need to deter drunk driving, they were consistent with the requirements placed on judges to discuss the objectives of the sentence. This court explained in State v. Gallion, 2004 WI 42, ¶ 40, 270 Wis. 2d 535, 678 N.W.2d 197, that "[c]ircuit courts are required to specify the objectives of the sentence on the record. These objectives include, but are not limited to, the protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others." The court also identified several mitigating and aggravating factors for sentencing courts to consider.[4] Id., ¶ 43 n.11.
*363 ¶ 62. Similar requirements have been incorporated into Wisconsin's statutes. Wisconsin Stat. § 973.017(2) provides:
When a court makes a sentencing decision concerning a person convicted of a criminal offense committed on or after February 1, 2003, the court shall consider all of the following:
(ad) The protection of the public.
(ag) The gravity of the offense.
(ak) The rehabilitative needs of the defendant.
(b) Any applicable mitigating factors and any applicable aggravating factors, including the aggravating factors specified in subs. (3) to (8).
Wis. Stat. § 973.017(2) (2009-10).[5]
¶ 63. Here, the circuit court judge fulfilled her obligations under the statute and Gallion. After her statements about her sister and the serious problem society has with drinking and driving, the judge reviewed elements of Herrmann's character. She observed that he had a habit of running away when things got difficult. She discussed Herrmann's poor *364 choices leading up to the accident, including his choice to drink and his choice to drive.
¶ 64. The judge considered that Herrmann had already been given opportunities to adjust his behavior. He previously had been fined and had the benefit of alcohol and drug assessments and treatment in the community and in an institutional setting. Additionally, he previously had the benefit of supervision. Throughout it all, Herrmann resisted treatment.
¶ 65. Stressing the gravity of the offense, the judge noted how many witnesses testified to the effects that Herrmann's crime had and continue to have on them. Lastly, as mitigating factors, the judge considered Herrmann's guilty plea, his age, and the fact that he has a family. It was after weighing all these factors that the court imposed Herrmann's sentence of 31 years initial confinement followed by 40 years of extended supervision, a sentence less than the 40 years confinement recommended in the PSI.
¶ 66. The circuit court's statements were made in compliance with the requirements of Wis. Stat. § 973.017(2) and Gallion. When viewed in that context, they do not reveal a great risk of actual bias. Accordingly, we determine that Herrmann has failed to rebut the presumption of impartiality.
V
¶ 67. In sum, there is a presumption that a judge acted fairly, impartially, and without prejudice. Goodson, 320 Wis. 2d 166, ¶ 8. A defendant may rebut the presumption by showing that the appearance of bias reveals a great risk of actual bias. Caperton, 556 U.S. at 885; Goodson, 320 Wis. 2d 166, ¶¶ 9, 14; Gudgeon, 295 Wis. 2d 189, ¶ 24, see also Williams-Yulee, 135 S. *365 Ct. 1660. Such a showing constitutes a due process violation. Gudgeon, 295 Wis. 2d 189, ¶ 23.
¶ 68. We conclude that Herrmann has failed to rebut the presumption of impartiality. When the sentencing court's statements are viewed in context, they do not reveal a great risk of actual bias. Because we determine that no due process violation has been established, we affirm the court of appeals.
By the Court. — The decision of the court of appeals is affirmed.

 State v. Herrmann, No. 2013AP197-CR, unpublished slip op. (Wis. Ct. App. Feb. 13, 2014) (affirming order of the circuit court for La Crosse County, Ramona A. Gonzalez, Judge).

 The court of appeals refers to a "great" risk of actual bias, State v. Gudgeon, 2006 WI App 143, ¶ 23, 295 Wis. 2d 189, 720 N.W.2d 114, and the United States Supreme Court refers to a "serious" risk of actual bias, Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 884 (2009). Although stated differently, the tests appear to be essentially the same.

 This difficult relationship with the issue of judicial recusal appears not only in our opinions but also in our administrative function of rule making.
In 2009 a majority of this court adopted verbatim the petition of Wisconsin Manufacturers & Commerce and the Wisconsin Relators that amended Wisconsin's rules of judicial conduct with regard to judicial recusal as it relates to judicial campaigns. In the matter of amendment of the Code of Judicial Conduct's rules on recusal; in the matter of amendment ofWis. Stat. § 757.19. S. Ct. Order 08-16, 08-25, 09-10 & 09-11, 2010 WI 73 (issued July 7, 2010, eff. July 7, 2010) (Bradley, J., dissenting, joined by Abrahamson, C.J., and Crooks, J.). In response, the Brennan Center for Justice, a non-partisan public policy and law institute at the New York University School of Law, observed that the majority's newly amended recusal rule "violated the spirit — if not the very letter" of Caperton. Jonathan Blitzer, Vanishing Recusal Prospects in Wisconsin, Brennan Center for Justice (Jan. 26, 2010). It expressed additional concern that the recusal rules were "a serious blow to the integrity of the Court." Id.
A similar concern that the majority's newly amended recusal rules subverted the integrity of the court was widely disseminated in editorials across the state:
• Milwaukee Journal Sentinel: "A breach in reality. In a 4-3 vote, justices thumb their noses at the perception of connec *356 tions between large campaign contributions and the court's integrity, objectivity and credibility." (Oct. 29, 2009)
• Appleton Post-Crescent: "Supreme Court rule robs public trust." (Nov. 1, 2009)
• Green Bay Press Gazette: "Big Money always finds a loophole." (Nov. 5, 2009)
• Eau Claire Leader Telegram: "High Court in session; bring your wallet." (Nov. 1, 2009)
• Racine Journal Times: "Supreme Court recusal rule is disgrace to state." (Nov. 2, 2009)
• Sheboygan Press: "Is justice for sale in Wisconsin?" (Nov. 2, 2009)
• Oshkosh Northwestern: "Supreme Court fails to clean blemished image." (Oct. 30, 2009).
In sidestepping the directive of Caperton, some on the court announced a heretofore unknown premise — never previously enunciated and not since embraced in the annals of this country's jurisprudence on judicial recusal. They advanced that the public's right to vote (which the justices found in the First Amendment of the United States Constitution) justified their lack of adherence to Caperton and its due process considerations. In the matter of amendment of the Code of Judicial Conduct's rules on recusal; in the matter of amendment of Wis. Stat. § 757.19, S. Ct. Order 08-16, 08-25, 09-10 & 09-11, 2010 WI 73 (Roggensack, J., separate writing).

 These include:
(1) Past record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and *363 social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention
State v. Gallion, 2004 WI 42, ¶ 43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197 (quoting Harris v. State, 75 Wis. 2d 513, 519—20, 250 N.W.2d 7 (1977)).

 All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.