COURT OF APPEALS
DECISION
DATED AND FILED

June 7, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP841**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2019SC1045**

**IN COURT OF APPEALS
DISTRICT III**

BRUCE RAYMOND SIEGFRIED,

  PLAINTIFF-APPELLANT,

 V.

MATT TORGERSON AND THE TORGERSON COMPANY LLC,

  DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Barron County: J. MICHAEL BITNEY, Judge. *Affirmed*.

¶1      GILL, J.[1]  Bruce Siegfried, pro se, appeals from an order dismissing his claims against Matt Torgerson ("Matt") and The Torgerson Company LLC

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

("Torgerson").[2] Siegfried contends the circuit court was biased in favor of the Defendants based upon the court's alleged familiarity with them. Siegfried also argues the court erred when it ruled that he did not meet his burden of proof and dismissed his claims for fraud and misrepresentation.[3] We reject Siegfried's arguments and affirm.

## BACKGROUND

¶2    Siegfried purchased from Torgerson a 2009 white Dodge Durango (hereinafter "the Durango") for $11,000 in Almena, Wisconsin, on November 14, 2016. The Durango was listed on Torgerson's website as having a "clean" title and a "CLEAN RUST FREE FLORIDA BODY …."

¶3    Siegfried inspected and test drove the Durango prior to purchasing it. After the test drive, he pointed out to a Torgerson salesperson that the Durango had "some type of a wobble in the wheel" and that there was rust on the engine compartment's bolts. Siegfried questioned if it was a "Florida vehicle,"[4] and a Torgerson employee responded, "[I]f you get too close to the ocean, you can get rust." At that point, Siegfried asked for a CARFAX report on the Durango, but he

---

[2] We refer to Matt and Torgerson, collectively, as "the Defendants."

[3] Siegfried generally alleged claims of misrepresentation and fraud in his complaint. That said, and as we will discuss in more detail later, he did not expressly allege any specific claims. At trial, the circuit court ultimately interpreted his claims to be for intentional misrepresentation and fraud. On appeal, we conclude that the nature of the claims in Siegfried's complaint are difficult to decipher, and will address the issue in detail later. *See infra* ¶25.

[4] Siegfried uses this language, as well as "Florida body." The circuit court at times used "Florida car." All three terms were used at the circuit court level to question whether the Durango was indeed from Florida due to the rust Siegfried found. We therefore use them interchangeably in the same manner.

was told the dealership did not use CARFAX. Siegfried did, however, note that the sticker in the Durango's window stated that it had a clean Florida title.

¶4    Thereafter, Siegfried purchased the Durango. The purchase agreement contained the following provision in paragraph six:

> This transaction is voidable at the option of the dealer or you if the certificate of title … contains information, which materially affects the value of such vehicle and which is not disclosed on the face of this contract, and provided that written notice exercising such option is mailed or personally delivered to the other party within two business days of the date the appropriate certificate of title has first been made available to dealer or you for inspection.

¶5    By the time he returned home to Minnesota, Siegfried noticed more wheel wobbling as well as rust on the rear tailgate. After taking the Durango into an auto repair shop, he learned that the right wheel was so badly bent that it could not be balanced.

¶6    In December of that year, Siegfried independently obtained a CARFAX report for the Durango. The report suggested that the Durango was hardly, if it all, driven in Florida and that of its more than 70,000 miles, most had been driven while the Durango was titled in New York and Ohio. In January 2017, he further learned that the Durango had been declared totaled by an insurance company in 2012 and had a Minnesota salvage title.[5] Within two business days, Siegfried sent a letter to the Defendants, asking "for a significant

_____

[5] A salvaged vehicle in Minnesota is a vehicle either: (1) "acquired by an insurer through payment of damages; (2) … for which the cost of repairs exceeds the value of the damaged vehicle; or (3) has an out-of-state salvage certificate of title as proof of ownership." MINN. STAT. § 168A.151(b) (2021). Wisconsin dealerships are required to disclose to a purchaser if a vehicle was previously salvaged. WIS. ADMIN. CODE § TRANS 139.04(6)(a)1. (Mar. 2020).

portion of [his] purchase price to be refunded along with the overpaid sales taxes ….."

¶7     In November 2019, Siegfried commenced this action against the Defendants raising claims based on his purchase of the Durango and demanding judgment for $6,215.  The Defendants answered, stating that they had "purchased the vehicle as being a clear title and received just that.  [The Defendants] used reasonable care on reporting the vehicle[']s history."

¶8     The matter was set for a trial date in February 2020, but Matt called Siegfried five days before the start of the trial stating that he would be asking for an adjournment.  In response, Siegfried told Matt to call him back after he spoke to the circuit court regarding the trial adjournment.  According to Siegfried, Matt replied that a return call would not be necessary because he was certain the judge would agree with the request, stating further, "I know the judge[.]"  Siegfried contends that when he replied, "What?" Matt again said, "I know the judge[.]"  According to Siegfried, Matt later clarified and said, "Well, I know of the judge."  Siegfried eventually agreed to the adjournment, and the trial was set for a date in March 2020.

¶9     The Honorable J. Michael Bitney presided over the March 12, 2020 bench trial, where both Siegfried and Matt testified.  During Siegfried's testimony, Judge Bitney asked why he did not back out of buying the Durango once he observed the rusted engine bolts and the wobbling back wheel.  In response, Siegfried testified that he went through with the purchase because the Defendants—both in person and on its website—stated it was a Florida vehicle, and because the title was listed as "clean," meaning not salvaged.

¶10 Following Siegfried's testimony, the circuit court questioned Matt, who testified that he had no knowledge of the Durango's salvage title, and that the Defendants had previously purchased "a lot" of vehicles from Florida and from this particular Florida dealership "a fair amount." Further, Matt testified that he "didn't lie to [Siegfried], [he] didn't try to hoodwink him, sell him a bag of goods. [He] sold him what [he] thought [he] had."

¶11 After Matt's testimony, and in response to Judge Bitney's question as to whether Siegfried had anything he would like to add, Siegfried testified that Matt had told him prior to trial that he knew the judge. In response, Judge Bitney said: "I don't know [Matt]. I don't socialize with him, I'm not related to him. If I had any personal connection to [Matt], I would have recused myself and had a different judge assigned to this case."

¶12 At the conclusion of the testimony, the circuit court dismissed Siegfried's claims for fraud and intentional misrepresentation because he failed to meet his burden of proof. Specifically, the court concluded that the Durango was purchased by Matt while it was in Florida. The court reasoned that, "It's only misrepresentation if you prove to my satisfaction that [Matt] knew that [the car was not from Florida] at the time that he sold you the car." According to the court, Siegfried failed to meet his burden on the Durango's origins:

> So when he says this is a Florida car, at least to a certain extent, it's true. It spent a few days, at least, in Florida, because that's where he went to the auction and bought it from. It wasn't like he bought it in New York and said I got this car in Clearwater[, Florida,] when he didn't. He bought it in Clearwater.

Additionally, Siegfried failed to meet his burden to show that the Defendants intentionally misrepresented the Durango's title status, concluding:

> [Matt] has testified in response to [Siegfried's] claims [that] he did not know that this car at one point in time had a salvage title. He did not know that the car had been in an accident; that he had simply purchased the car at an auction in Florida as he has done a number of times, brought it back to Wisconsin on a flatbed and then sold it.

¶13 In all, the circuit court ruled that Siegfried had failed to show by the greater weight of the credible evidence that the Defendants had committed any intentional misrepresentation or engaged in fraud when selling the Durango to Siegfried. Siegfried now appeals, arguing that: (1) Judge Bitney was biased against him at trial; and (2) the court erred by not concluding that the evidence at trial met the elements of misrepresentation and fraud.

## DISCUSSION

### I. Judicial bias

¶14 The right to an impartial judge is a basic requirement of due process. *In re Murchison*, 349 U.S. 133, 136 (1955). We presume that a judge has acted fairly, impartially, and without bias. *State v. Herrmann*, 2015 WI 84, ¶24, 364 Wis. 2d 336, 867 N.W.2d 772. To overcome that presumption, the burden is on the party asserting judicial bias to show by a preponderance of the evidence that there was bias. *Id.* Whether the circuit court was objectively biased presents a question of law that this court reviews de novo. *Id.*, ¶23.

¶15 Wisconsin courts apply two tests to determine if the presumption is overcome: one subjective and one objective. *Id.*, ¶26. The subjective test asks judges to disqualify himself or herself if he or she subjectively determines that they are unable to remain impartial. *State v. Walberg*, 109 Wis. 2d 96, 105-06, 325 N.W.2d 687 (1982). At trial, Judge Bitney affirmatively stated that he did not

know Matt, and Siegfried presented no evidence to the contrary. Therefore, we proceed only under the objective analysis.

¶16 The United States Supreme Court has established that a "serious risk of actual bias" can create a due process violation. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009). A serious risk of actual bias analysis focuses "on objective and reasonable perceptions."[6] *Miller v. Carroll*, 2020 WI 56, ¶24, 392 Wis. 2d 49, 944 N.W.2d 542 (quoting *Caperton*, 556 U.S. at 884). To determine if such a violation occurred, we must "assess whether 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Id.*, ¶22 (quoting *Caperton*, 556 U.S. at 883-84). In other words, "'[d]ue process requires an objective inquiry' into whether the circumstances 'would offer a possible temptation to the average … judge to … lead him [or her] not to hold the balance nice, clear and true.'" *Id.*, ¶24 (quoting *Caperton*, 556 U.S. at 885). Situations where there is a serious risk of actual bias are "rare" and require "extreme facts." *Id.*, ¶¶22, 24 (quoting *Caperton*, 556 U.S. at 887, 890).

---

[6] Our supreme court's recent decision in *Miller v. Carroll*, 2020 WI 56, ¶25 n.18, 392 Wis. 2d 49, 944 N.W.2d 542, highlights a disagreement within the development of judicial bias jurisprudence over the last two decades. One position "relies on the exact language used by the United States Supreme Court in" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). *Miller*, 392 Wis. 2d 49, ¶¶22, 24-25 & n.18 ("We ask whether there is 'a serious risk of actual bias—based on objective and reasonable perceptions.'" (citation omitted)). Conversely, the other side advocates for an "appearance of bias" framework that asks whether the "appearance of bias reveals a serious [or great] risk of actual bias." *Id.*, ¶¶41-42, 51 (A.W. Bradley, J., concurring); *see also State v. Herrmann*, 2015 WI 84, 364 Wis. 2d 336, 867 N.W.2d 772 (plurality opinion); *State v. Goodson*, 2009 WI App 107, ¶14, 320 Wis. 2d 166, 771 N.W.2d 385; *State v. Gudgeon*, 2006 WI App 143, ¶23, 295 Wis. 2d 189, 720 N.W.2d 114. Under either test, the standard that a party asserting judicial bias must demonstrate to overcome the presumption of impartiality is "a serious risk of actual bias." For that reason, going forward, we will use the language relied on by *Caperton* and *Miller*.

¶17     Siegfried makes a variety of claims against Judge Bitney, which he contends provide evidence that he did not receive a fair trial.[7]  To the extent we do not address all of Siegfried's arguments pertaining to judicial bias, we deem them to lack sufficient merit to warrant individual attention.  *See State v. Waste Mgmt. of Wis.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978); *M.C.I., Inc. v. Elbin*, 146 Wis. 2d 239, 244-45, 430 N.W.2d 366 (Ct. App. 1988) (we do not need to consider underdeveloped arguments).[8]

---

[7]  We first note that Siegfried bases his judicial bias claims largely on his allegations that Judge Bitney violated the Wisconsin Supreme Court Rules (SCR), particularly SCR ch. 60:  Code of Judicial Conduct.  A violation of the rules "does not automatically constitute a violation of due process."  *Miller*, 392 Wis. 2d 49, ¶89 (Ziegler, J., concurring).  That said, we may consider the SCR when analyzing a claim of objective bias.  *See State v. Pinno*, 2014 WI 74, ¶94, 356 Wis. 2d 106, 850 N.W.2d 207.  We will therefore address these arguments invoking the SCR when warranted, but the rules do not create an independent cause of action.

[8]  For example, Siegfried alleges that Judge Bitney "made up his mind as to his order before trial."  To support this claim, Siegfried states that Judge Bitney did not adequately review all of the documents Siegfried had provided to him, nor did he ask questions about the documents.  Further, Siegfried argues that the trial was not long enough, lasting "only 69 minutes."  Siegfried does not cite to any authority requiring Judge Bitney to look at every document—it is sufficient for a judge to review what he or she finds to be the most relevant documents, if any.  *See* WIS. STAT. § 799.209(2) ("The court … shall admit all other evidence having reasonable probative value, but may exclude irrelevant or repetitious evidence or arguments.").  Nor does Siegfried cite to any authority, nor are we aware of any such authority, that dictates the length of a small claims trial.  Therefore, we conclude that Siegfried fails to show objective bias as to these particular claims.

Siegfried also cites to internet reviews to support his judicial bias claim.  Specifically, he provides a link to the website "The Robing Room," with "only two reviews [of Judge Bitney], both negative."  The reviews, according to Siegfried, say that Judge Bitney "hates non-lawyers" and "thinks he is MUCH higher and more important than other people who enter 'HIS' courtroom."  Siegfried fails to demonstrate how these reviews evidence judicial bias here—especially given that both parties in this case appeared pro se at trial.

Further, Siegfried contends that Judge Bitney: (1) set different legal standards for Siegfried and the Defendants; (2) scolded Siegfried for not filing a complaint with the Wisconsin Consumer Protection Bureau; (3) only asked basic questions of Matt and never asked for any documents from Matt; (4) ignored evidence that Siegfried presented; and (5) was unprepared for trial.  Siegfried's arguments regarding these issues are either underdeveloped or fail to demonstrate by a preponderance of the evidence that Judge Bitney's conduct was contrary to established law.

¶18    Siegfried takes issue with certain comments made and questions posed by the circuit court during the course of trial, which Siegfried claims evidence an appearance of bias and unfairness because the comments and questions demonstrated an "out of state prejudice." In particular, at the beginning of the trial Judge Bitney asked Siegfried how "a person from the Twin Cities end[s] up at a used car dealership way over in little Almena, Wisconsin?" Later, Siegfried asserted that a Minnesota Department of Motor Vehicles (DMV) employee explained to him that any dealer not communicating that a title is salvaged is committing fraud. In response, Judge Bitney said, "I don't care what Minnesota said, okay? We're in Wisconsin, we're in Barron County," and "What did that advice cost you? Nuthin.' That's about what it's worth in a court of law." According to Siegfried, Judge Bitney's comments demonstrated bias and were violations of SCR 60.04.

¶19    Examining the record as a whole, it is evident that the questions and comments about which Siegfried complains were part of a larger scope of questions, which, when viewed in context, do not evidence judicial bias by a preponderance of the evidence. Specifically, there are no objective facts that show, and no reasonable person would conclude, that Judge Bitney was prejudiced against Siegfried because he was from out of state. For example, Siegfried's answer to the inquiry about why he purchased a car in Almena was that, in the past, he has flown to Arizona to buy rust-free cars. This time, however, his "friend who used to live in Minneapolis [and] moved to Arizona … [had] alerted" him to the Durango, saying he found it on Craig's List and that it "would save [Siegfried] a trip down to Arizona." Judge Bitney replied, "If you could find something rust free closer to home … so to speak." In other words, this dialogue showed that the judge properly attempted to obtain background information, and

9

he acknowledged and accepted Siegfried's explanation. Obtaining such background information does not substantiate, by a preponderance of the evidence, that Judge Bitney was biased based on Siegfried's state of residence.

¶20 Further, the circuit court, in its discretion, could discount the Minnesota DMV employee's comments regarding fraud as they were hearsay. In addition, the Minnesota DMV does not have any mandatory authority in Wisconsin. The issue at trial was whether the Defendants committed fraud under Wisconsin law. In short, the contextual circumstances around these exchanges demonstrate that the court was inquiring into, or commenting on, practical and not improper matters, and they do not show by a preponderance of the evidence that the court was biased against Siegfried for being from Minneapolis. Thus, we reject his claim in this regard.

¶21 For the same reasons the comments do not show bias, Judge Bitney's comments do not violate SCR 60.04, which Siegfried cites in support of his judicial bias claim. "SCR 60.04, A judge shall perform the duties of judicial office impartially and diligently[,]" requires judges, in relevant part, to "act so that the judge's attitude, manner or tone toward counsel or witnesses does not prevent the proper presentation of the cause or the ascertainment of the truth. A judge may properly intervene if the judge considers it necessary to clarify a point or expedite the proceedings." SCR 60.04(1)(d). Further, it forbids judges from "manifest[ing] bias or prejudice, including bias or prejudice based upon race, gender, religion, national origin, disability, age, sexual orientation or socioeconomic status …." SCR 60.04(1)(e).

¶22 Here, any interrupting or questioning of Siegfried by Judge Bitney was permitted under SCR 60.04(1)(d) to "clarify a point or expedite the

proceedings." The interruption was particularly permissible in this case to expedite the trial because the Minnesota law conversation was irrelevant hearsay. As discussed previously, Judge Bitney's comments about where Siegfried was from, or how Minnesota law was irrelevant to this case, did not demonstrate objective bias by a preponderance of the evidence. Siegfried's citations to the SCR have not demonstrated otherwise.

¶23 Siegfried further claims there existed judicial bias based on the alleged fact that Matt "knew" Judge Bitney or that Judge Bitney had previous business contacts with the Defendants. We disagree. The sole basis for Siegfried's claim in this regard is Matt's alleged statement to him that Matt "kn[ew] the judge." Siegfried asserts, while citing no actual evidence, that "[s]ince [Matt] stated in court that he had never been in court before that would mean [Matt]'s knowledge of Judge Bitney had to come from outside of the courtroom." Siegfried further asserts that "it is possible one of [Torgerson's] employees may have completed a business transaction involving Judge Bitney in some form …."

¶24 Examined objectively, there are no facts in the record showing that Judge Bitney had any prior relationship with either of the Defendants or that he treated Siegfried unfairly based on any relationship with the Defendants. Nor would a reasonable person conclude that Siegfried received an unfair trial based on an alleged relationship between Judge Bitney and the Defendants. Aside from Matt's alleged statement that he knew Judge Bitney—which even by Siegfried's own admission Matt clarified that he "*kn[e]w of* the judge" (emphasis added)—Siegfried presents no evidence of a relationship between Judge Bitney and the Defendants. Judge Bitney denied at trial that he had any personal connection to Matt, saying that if he had any connection, he would have recused himself.

Siegfried acknowledges that he has failed to meet his burden, stating he "cannot prove that there is a relationship between Defendant[s] and Judge Bitney …." Because we find no evidence that Judge Bitney knew either of the Defendants, we are not persuaded by Siegfried's reference to SCR 60.03(2), which forbids a judge from allowing "family, social, political or other relationships to influence the judge's judicial conduct or judgment," and we reject this claim as well.

## II. Intentional misrepresentation and fraud claims

¶25 Siegfried next claims that the circuit court erred by finding that he failed to prove his intentional misrepresentation and fraud claims by clear and convincing evidence. Again, we disagree. We first pause to again note that the nature of Siegfried's claims—as asserted in his complaint, at trial, and now on appeal—are difficult to decipher and, at times, contradict each other.[9] Siegfried's complaint, while containing a lengthy narrative and extensive attachments, failed to identify the specific causes of action being levied against the Defendants. The

---

[9] For example, Siegfried criticizes the circuit court for applying the fraud standard at trial, arguing that his "complaint does not mention the word fraud …." The complaint, however, included an exhibit "[s]how[ing] possible evidence of … fraud for not disclosing salvage status …." Further, throughout his appellate brief, Siegfried argues for misrepresentation to be applied—intentional misrepresentation is the same common law claim as fraud. Additionally, Siegfried argues on appeal that his complaint was about "two significant misrepresentations"— the Durango not being a "Florida vehicle" and the title status not being clean. Siegfried's complaint, however, failed to include any "misrepresentation" language. Following the Defendants' response to Siegfried's complaint, Siegfried filed a "Rebuttal to Defendant's Response." In that document, Siegfried asserted misrepresentation claims regarding the Durango not having a "Florida body" and the title not being clean.

Therefore, as with Siegfried's arguments regarding his judicial bias claims, we have attempted to identify and address the arguments raised by Siegfried pertaining to his specific misrepresentation claims on appeal. *See State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978). To the extent we do not address some of Siegfried's arguments, we deem them to lack sufficient merit to warrant individual attention. *See id.*

court interpreted Siegfried's claims as being for intentional misrepresentation and fraud. Any other claims were either not in the complaint or not raised at trial.

¶26 We review a circuit court's findings of fact under a clearly erroneous standard. *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶34, 319 Wis. 2d 1, 768 N.W.2d 615; WIS. STAT. § 805.17(2). Under this standard, we defer to the circuit court's findings of fact unless they are unsupported by the record. *Rosyer-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530. In other words, "even though the evidence would permit a contrary finding, findings of fact will be affirmed on appeal as long as the evidence would permit a reasonable person to make the same finding." *Id.*, ¶12 (citation omitted). Moreover, we search the record for evidence supporting the circuit court's decision. *Id.* Whether a party has met his or her burden of proof at trial, however, is a question of law that this court reviews de novo. *Wolfe v. Wolfe*, 2000 WI App 93, ¶14, 234 Wis. 2d 449, 610 N.W.2d 222.

¶27 The issues before us are whether the circuit court erred by finding that Siegfried failed to meet his burden of proving that the Defendants intentionally misrepresented the Durango's title status or intentionally misrepresented the Durango as being a "Florida vehicle."[10] At the close of the

---

[10] We will assume without deciding that an intentional misrepresentation claim in this case is not barred by the economic loss doctrine. *See Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶¶23, 29, 270 Wis. 2d 146, 677 N.W.2d 233 (economic loss doctrine precludes contracting parties from pursuing tort recovery for purely economic losses associated with a contractual relationship); *Brame v. General Motors LLC*, 535 F. Supp. 3d 832, 841-42 (E.D. Wis. 2021) ("economic loss doctrine applies to common-law fraud claims alleging that the seller of a product made misrepresentations pertaining to 'the character and quality of the goods that are the subject matter of the contract.'" (citation omitted)); *Hinrichs v. DOW Chem. Co.*, 2020 WI 2, ¶¶33-35, 389 Wis. 2d 669, 937 N.W.2d 37 (discussing the fraud in the inducement exception to the economic loss doctrine, which requires intentional misrepresentation to be proven); WIS JI—CIVIL 2400 (2021).

trial, the court ruled that it was "not satisfied that [Siegfried] ha[d] proven by the greater weight of the credible evidence that the [Defendants] intentionally defrauded [Siegfried] by selling him something other than what he thought he was driving."[11]  Siegfried contends this determination was erroneous because he met his burden to show intentional misrepresentation and fraud.

¶28    To show intentional misrepresentation—i.e., "common-law fraud"—a plaintiff is required to prove five elements by the greater weight of the credible evidence:

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶12, 283 Wis. 2d 555, 699 N.W.2d 205.  "Reckless" representations in the third element are those "made by a person who knows that he or she has no sufficient basis of information to justify them."  WIS JI—CIVIL 2401 (2018).

¶29    To support his misrepresentation claims, Siegfried argues that the Durango was never owned by a Florida individual or driven on Florida roads.

---

[11] On appeal, Siegfried also claims that the circuit court incorrectly applied an "as is" analysis to the intentional misrepresentation claims.  *See Grube v. Daun*, 173 Wis. 2d 30, 59-61, 496 N.W.2d 106 (Ct. App. 1992) (discussing the effect "as is" language in a purchase agreement has on misrepresentation claims), *overruled on other grounds by Marks v. Houston Cas. Co.*, 2016 WI 53, 369 Wis. 2d 547, 881 N.W.2d 309.  To the contrary, the court concluded that the "as is" language in the purchase agreement would negate any "express, implied or other warranties unless noted."  Because Siegfried was not making a breach of warranty claim, which he confirmed at trial, we will not address this issue.

Further, according to Siegfried, the Durango was last titled in Ohio, and the Defendants knew this fact because "Ohio was the only state with a Certificate of Title …." Specifically, Siegfried contends the Defendants misrepresented that the title was "clean" and was "from" Florida, and they purposefully deceived Siegfried through oral statements they made and the window sticker they used. Siegfried also points out that, at trial, Matt testified,

> [T]here was some misrepresentation … on the Craig's List [ad]. I look at that ad, it was a Florida car, we bought it out of Florida, but I think as a consumer, you would look at it and say well, could that be a Florida car your whole life? So shame on us ….

¶30 We will address Siegfried's claims in two parts. First, we will analyze Siegfried's claim that the Defendants intentionally misrepresented the Durango as having a clean title. As we will explain, Siegfried fails to meet his burden to show intentional misrepresentation by clear and convincing evidence given the circuit court's factual findings, which are not clearly erroneous. Specifically, Siegfried fails on the third element—i.e., that the Defendants either had: (1) knowledge about their misrepresentation being untrue; or (2) that the Defendants made the misrepresentation recklessly without caring whether it was true or untrue. Even if Siegfried could show that the Defendants recklessly made the representation, he would still fail on the fourth element—i.e., that the Defendants made the representation with the intent to defraud him. Second, we will analyze Siegfried's claim that the Defendants intentionally misrepresented the Durango as being a "Florida car." As we will explain, Siegfried fails to show that the court's factual findings were clearly erroneous. Because of the factual findings, he fails to meet his burden on the second element—i.e., that the Defendants' representation was untrue.

15

¶31    We first begin with Siegfried's claim that the Defendants intentionally misrepresented the Durango as having a clean title.   At trial, Siegfried testified that he received three titles in the mail after the purchase—a Florida title, a Wisconsin title, and an Ohio title.   In Siegfried's complaint, he stated that he did not find out the Durango's title was salvaged until after he received the CARFAX report and after he went to the Minnesota DMV.   During Matt's testimony, he explained: "The title is from Ohio that Mr. Siegfried had gotten.   It was transferred over to a Florida dealer and then sold in Florida."   The circuit court then asked, "Did you have any information that there had been perhaps multiple title transfers on the vehicle?"   In response, Matt answered, "No, other than the assignments on the existing title that we had.   It said that a dealer bought it and sold it to another dealer, and I believe that's who we bought it from."   On follow-up, the court asked, "So these other titles, you weren't aware of that?"   Matt replied that he was not.   Further, Matt presented the Ohio title to the court at trial to show that the title was clean.

¶32    Siegfried fails to show that the circuit court's finding that the Defendants did not know about the salvage title or other titles was clearly erroneous.   The evidence at trial supports the court's finding that Matt had no knowledge of the other titles—all he had was the clean Ohio title and the subsequent title transfers and reassignments.   Only after Siegfried had obtained the title for the Durango in Minnesota and checked the CARFAX report did he learn that the Durango actually had a salvage title, supporting the court's finding that Matt did not know about the salvage title because he did not have a CARFAX report.   On this record the court reasonably found: "I don't have any credible information, testimony or evidence before me this afternoon that [the Defendants]" knew about the salvage title.   Based on that finding of fact, we

16

cannot conclude that Siegfried meets his burden to show intentional misrepresentation of the Durango's title status.

¶33  Similarly, Siegfried fails to establish that the Defendants recklessly made the misrepresentation about the Durango's title being clean and with the intent to defraud Siegfried.  Again, reckless representations are those "made by a person who knows that he or she has no sufficient basis of information to justify them."  WIS JI—CIVIL 2401 (2018).  In terms of the reasonableness of Matt's actions leading to the sale of the Durango to Siegfried, Matt testified, and the circuit court found, that he purchased the Durango in Florida as he had done "a number of times" in the past, particularly from the same company where he bought the Durango.  Matt also testified that since 2000, Torgerson had sold "3,500 vehicles" and never "had to deal with [a title issue]."  There is no evidence to suggest the Defendants purchased the Durango using a different process.  Matt testified that he did receive documentation that there was a transfer of the Ohio title to Florida and that the title was clean.

¶34  Furthermore, even if we concluded that the Defendants recklessly made the misrepresentation, Siegfried still fails to show that the Defendants were claiming the title was clean with the intent to defraud Siegfried.  If the Defendants believed the title was clean, which the circuit court found, there cannot be an intent to defraud.

17

¶35 Siegfried also fails to show that the Defendants misrepresented the Durango's origins and did so with the requisite intent to defraud.[12] At trial, the circuit court made a factual finding that the Durango was, in fact, from Florida. *See supra* ¶12. There is no evidence in the record that would lead us to conclude that the court's finding that the Durango was in Florida for some amount of time was clearly erroneous. Siegfried points to Matt's "admission" that "there was some misrepresentation … on the Craig's List" advertisement. Matt clarified that testimony, saying, "it was a Florida car, we bought it out of Florida …." Further, Siegfried acknowledged at trial that there was a transfer of title, or transfer documents, for the Durango from Ohio to Florida. It does not matter, for purposes of establishing intentional misrepresentation, that the Defendants did not inform Siegfried that the Durango was previously titled in in Ohio, because the Durango was technically a "Florida" car" at the time of its sale to Siegfried, given the

---

[12] To the extent Siegfried claims the representation was incorrect because the advertisement said "rust free" Florida body, he still fails to show intentional misrepresentation. Given the circuit court's finding of fact, that Siegfried did not purchase "something other than what he thought was driving," Siegfried fails on the fifth element—that he believed the statement to be true and relied on it to his detriment. He observed the rust on the bolts in the engine compartment before purchasing the Durango. The court found that both parties acknowledged the rusty engine bolts and that Siegfried still went through with the purchase, despite the signs of rust. Based on those facts, which are not clearly erroneous, Siegfried fails to show intentional misrepresentation.

court's finding that it was titled in Florida.[13]   Under these circumstances, we cannot say the court clearly erred in its application of the facts—i.e., the Durango was from Florida and therefore there cannot be a misrepresentation.

¶36   In all, Siegfried fails to show that the circuit court's finding of fact— that the Defendants did not know about the alleged title issues—was clearly erroneous.   If the representation was reckless, it was not intended to defraud Siegfried.   Similarly, the court's finding that the Durango was a "Florida body" was not clearly erroneous.   Given those factual findings, Siegfried fails to meet his burden to establish intentional misrepresentation by the greater weight of the credible evidence, and the court did not err in so ruling.

## III.  Other claims raised by Siegfried

¶37   Siegfried raises four additional issues on appeal.  He argues that the circuit court erred by: (1) requiring him to prove knowledge for his misrepresentation claim for it to be successful; (2) failing to mention the Wisconsin Administrative Code; (3) failing to rule on an alleged breach of

---

[13] Siegfried also points to the Durango's window sticker as evidence that the Defendants intentionally misrepresented that the Durango was from Florida.  The window sticker, in the "Title Brands" box stated "All states titled in: FL."  Siegfried contends the box should have stated Ohio and not Florida.  Because there was a transfer of title for the Durango from Ohio to Florida, and ultimately the Durango was titled in Florida, we conclude that the Defendants' indication it was a Florida-titled vehicle does not meet the elements of intentional misrepresentation.  Specifically, the representation by the Defendants that the Durango was titled in Florida was true because they possessed the transfer of title, or title documents, and because the vehicle was ultimately titled in that state.  To the extent that set of facts did not meet the definition of "titled in," there is no evidence the representation was made with the intent to defraud Siegfried, but rather the findings of fact made by the circuit court show the Defendants believed it was true. *See supra* ¶32.

contract claim under paragraph six of the purchase agreement; and (4) failing to adhere, in Siegfried's view, to SCR 60.04.[14]

¶38    Siegfried first argues that he should not have had to prove that the Defendants knew about the Durango's title issues or that the Durango was not a "Florida vehicle" in order to prove misrepresentation.  He also made this argument during the trial.  After the circuit court explained that Siegfried had to show knowledge, Siegfried claimed that the Defendants "should have known" about the Durango's title history.  There are two misrepresentation claims that include similar elements to a "should have known" standard—negligent misrepresentation and strict responsibility.

¶39    To the extent Siegfried may have alleged negligent misrepresentation or strict responsibility, those claims fail because they are barred under the economic loss doctrine.  *See supra* n.10.  The economic loss doctrine is a judicially created doctrine adopted by our supreme court in 1989 that seeks

> (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Kaloti*, 283 Wis. 2d 555, ¶¶27, 28 (citation omitted).  Wisconsin courts have applied the economic loss doctrine to bar negligent misrepresentation claims, *Prent Corp. v. Martek Holdings, Inc.*, 2000 WI App 194, ¶21, 238 Wis. 2d 777, 618 N.W.2d 201, and strict responsibility claims, *Van Lare v. Vogt, Inc.*, 2004 WI

---

[14] For example, Siegfried alleges the circuit court violated SCR 60.04 because it only questioned Matt using "basic questions … and never asked for any documents from him."

110, ¶2, 274 Wis. 2d 631, 683 N.W.2d 46. *See also* **Kaloti**, 283 Wis. 2d 555, ¶30. Such an application does not, however, leave parties without a remedy to seek, as "the [economic loss doctrine] still leaves statutory and contractual remedies available where misrepresentation has occurred." **Below v. Norton**, 2008 WI 77, ¶42, 310 Wis. 2d 713, 751 N.W.2d 351.

¶40 For purposes of the economic loss doctrine, an "economic loss" is defined as "damages resulting from inadequate value because the product is inferior and does not work for the general purposes for which it was … sold," **id.**, ¶29 (citation omitted), and extends to consumer transactions. **Wausau Tile, Inc. v. County Concrete Corp.**, 226 Wis. 2d 235, 246 n.7, 593 N.W.2d 445 (1999). "Economic loss may be either direct or consequential. Direct economic loss is 'loss in value of the product itself.' All other economic loss caused by the product defect, such as lost profits, is consequential economic loss." **Id.** at 246 (citations omitted). Here, Siegfried clearly suffered a direct economic loss—the Durango's value decreased due to the alleged misrepresentations. Because he did not claim or argue any statutory or contractual remedies for misrepresentation, any claims for negligent misrepresentation or strict responsibility are barred by the economic loss doctrine.

¶41 Moreover, Siegfried failed to allege any Wisconsin Administrative Code or breach of contract claims in his complaint, or present proof of them at trial. The claims were not presented to the circuit court for resolution, and, accordingly, they are not properly before this court. *See* **Hlavinka v. Blunt, Ellis & Lowei, Inc.**, 174 Wis. 2d 381, 403-04, 497 N.W.2d 756 (Ct. App. 1993) (plaintiff's failure to give sufficient detail in complaint regarding what plaintiff is complaining fails to give adequate notice and the issue does not go before the court); *see also* **Bishop v. City of Burlington**, 2001 WI App 154, ¶8, 246 Wis. 2d

879, 631 N.W.2d 656 ("A litigant must raise an issue with sufficient prominence such that the trial court understands that it is being called upon to make a ruling.").

¶42 Additionally, even if we assume without deciding that Siegfried stated a claim for breach of contract in his complaint, based upon paragraph six of the contract, such a claim fails as Siegfried did not seek to void the contract. Paragraph six of the contract allowed the parties to void the contract in the event they discovered information relating to the certificate of title which materially affected the value of the vehicle, and which was not disclosed on the face of the contract. Siegfried, however, did not seek to rescind the purchase agreement. In his January 2017 letter to the Defendants, Siegfried instead sought the return of a "significant portion of [his] purchase price to be refunded along with the overpaid sales taxes …." This was not an available remedy under the parties' contract. Siegfried did not properly exercise his contractual right under paragraph six, and, accordingly, any breach of contract claim pursuant to paragraph six fails.

¶43 Finally, Siegfried fails to explain how the SCR are relevant to his misrepresentation claims. It is difficult to determine whether he intended the rules as support for his other intentional misrepresentation and fraud claims or if he intended them as independent causes of action. To the extent the SCR are cited as support for his intentional misrepresentation and fraud claims, Siegfried does not explain how they do so. We will therefore not address his conclusory arguments regarding the SCR. *See M.C.I.,* 146 Wis. 2d at 244-45 (we do not need to consider underdeveloped arguments).

¶44 If the rules are cited to stand as independent causes of action, Siegfried ignores the preamble to Chapter 60 of the SCR. It states, in relevant part, that the rules are "not designed or intended as a basis for civil liability or

22

criminal prosecution. Furthermore, the purpose of the Code would be subverted if the Code were invoked by lawyers or litigants for mere tactical advantage in a proceeding." SCR ch. 60, Preamble; *see also* **Sands v. Menard**, 2017 WI 110, ¶62, 379 Wis. 2d 1, 904 N.W.2d 789 ("the preamble to the Supreme Court Rules clearly demonstrates that alleged violations are to be determined in disciplinary proceedings, not civil litigation."). Thus, Siegfried cannot use the SCR as independent causes of action on appeal, and we will not address them as such.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.